IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


CATHERON PATE,                 )
                               )
        Plaintiff,             )
                               )   CIVIL ACTION NO.
        v.                     )     2:04cv1131-T
                               )        (WO)
WEST PUBLISHING                )
CORPORATION,                   )
                               )
        Defendant.             )

OPINION

Plaintiff Catheron Pate, an American woman of Korean descent, brings this lawsuit against defendant West Publishing Corporation under two federal statutes: Title VII of the Civil Rights Act, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e-17 ("Title VII"); and Civil Rights Act of 1866, as amended, 42 U.S.C.A. § 1981 ("1981").[1]  Pate claims that she was terminated from her employment with West because of her race and sex, and that she was subjected to a hostile-work environment.

_____

1.  Pursuant to an order dated August 22, 2005 (Doc. No. 20), Pate's claims of retaliation and breach of contract were dismissed.

Jurisdiction over Pate's Title VII claim is proper under 42 U.S.C.A. § 2000e-5(f)(3), and over her § 1981 claim under 28 U.S.C.A. § 1343.

Having reviewed the factual record in detail, the court concludes, for reasons given below, that West's motion for summary judgment should be granted.

### I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Fitzpatrick v. City of

<u>Atlanta</u>, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56).  The non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials in the pleadings.  Fed. R. Civ. P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

## II. BACKGROUND

The following facts are construed in Pate's favor as the non-moving party: Pate was hired by West as an

3

academic account manager in January 1998.  She received numerous awards and reward trips for her outstanding performance, and never received less than a rating of "far exceeds expectations" on her performance evaluations.[2]

Pate and approximately 2,000 other West employees attended the company's annual national sales conference from January 28 to February 1, 2004, at an Arizona hotel. On January 30, after a dinner at which alcohol was served, many employees congregated in the hotel bar.[3] Pate and a group of approximately 13 other West employees engaged in an "adult" conversation that included discussion of who wore underwear and who did not.  Two white male employees placed their hands inside Pate's jeans; another white male employee touched Pate's breasts; a white female employee asked Pate to return to

---

2.  Defendant's motion for summary judgment (Doc. No. 21), Exhibit D, Affidavit of Chris Parton, p. 1.

3.  Id., Exhibit A, deposition of Catheron Pate("Pate deposition"), pp. 150-151.

the employee's room to touch her breasts; and a second white female employee walked around the bar asking others if they wanted to touch her breasts.[4]

Pate pulled the belt buckles of two male employees, completely removing the belt of one of the men.  At a certain point, Pate gestured for Rodney Buhrsmith, a senior director of strategic marketing, to approach. Apparently at the urging of a white male employee who suggested that they determine whether Buhrsmith was wearing underwear, Pate pulled Buhrsmith's sweatpants to his knees, revealing to the group that he was not, in fact, wearing underwear.[5]  Buhrsmith pulled his pants up, laughed, and returned to his room shortly thereafter.[6] In the middle of the night, Buhrsmith awoke and realized that he had "lost an opportunity to show good

_____

4.  Pate deposition, p. 156.

5.  Pate deposition, p. 175.

6.  Defendant's motion for summary judgment (Doc. No. 21), Exhibit B-1, notes of investigation conducted by Rebecca Rocke ("Rocke investigation notes"), p. 2 (conversation with Wayne Leuthmers).

leadership."[7]  The next morning, he instructed Pate and the employees who had witnessed the events of the previous evening to meet with him after one of the conference sessions.  At that meeting, he advised the employees that, while he had personally not been humiliated by Pate's behavior, any employee who felt uncomfortable had a right to talk to management.[8]  Pate stood and apologized for her behavior.  She subsequently sent an e-mail to the group that read:

> "Hello Everyone,
>
> "I would like to again sincerely apologize to Rodney and to those of you present last night for my behavior. This unfortunate incident has made me seriously re-evaluate my thoughts on what is and is not appropriate. I have absolutely no excuse for my actions. I promise you that I will behave with the utmost professionalism and respect that my managers and co-workers deserve from this day forward.
>
> "Again,

---

7.  Rocke investigation notes, p. 3 (conversation with Rodney Buhrsmith).

8.  Id.

"I sincerely apologize.

"Catheron Pate"[9]

Buhrsmith explained what had happened to the director

of the academic segment, the West division in which Pate

was employed.[10]   At least three of the male employees,

including one of the men whose belt Pate had pulled, also

complained of her behavior to West management.[11]   All of

these reports reached Rebecca Rocke, a West human

resources manager who did not attend the conference.

West's Code of Business Conduct and Ethics contains

the following discussion of discrimination:

> "Workplace discrimination and harassment
> will not be tolerated. ... Thomson[12] has

_____

9. Defendant's motion for summary judgment (Doc. No.
21), Exhibit A-5, Pate apology e-mail.

10. Rocke investigation notes, p. 3 (conversation
with Rodney Buhrsmith).

11. Defendant's motion for summary judgment (Doc. No.
21), Exhibits F, G, and I, Affidavits of John Lim, Wayne
Luethmers, and Tony Buscemi.

12. West Publishing Corporation, defendant in this
action, forms part of the Thomson corporation, a provider
of   electronic   and   print   information.
(continued...)

zero tolerance for harassment.
Harassment generally means offensive
verbal or physical conduct that singles
out a person to the detriment or
objection of that person. Harassment
covers a wide range of conduct, from
direct requests of a sexual nature to
insults, offensive jokes or slurs, and
results in a hostile work environment.
... Reports of harassment will be
promptly and thoroughly investigated in
as confidential a manner as possible.
We will take immediate and appropriate
action if harassment is determined to
have occurred."[13]

Disciplinary action for violations of the code is also

described:

"Thomson strives to impose discipline
for each Code violation that fits the
nature and particular facts of the
violation. A failure by any employee to
comply with laws or regulations
governing company business, this Code or
any other company policy may result in
disciplinary action up to, and

_____

12. (...continued)
http://west.thomson.com/overview/.

13. Defendant's motion for summary judgment (Doc. No.
21), Exhibit A-17, Code of Business Conduct and Ethics,
p. 164.

8

including, termination, and if
warranted, legal proceedings."[14]

While conducting her investigation, Rocke spoke with
Pate and Buhrsmith and with other employee-witnesses to
the events in question.[15]  Pate, who has never denied her
actions, was assured by Rocke that, as an "award-winning
person," she would be "all right."[16]  Pate was nonetheless
fearful for her position, and asked Rocke for permission
to ask others present at the scene to call and explain to
Rocke the context in which she had acted.  Rocke agreed,
and two individuals called her, including Buhrsmith, who
did not personally wish to see Pate fired.[17]  However,
another employee felt uncomfortable with Pate's entreaty,
and communicated her discomfort to Rocke, who

---

14.  Id., p. 173.

15.  Defendant's motion for summary judgment (Doc. No.
21), Exhibit B, affidavit of Rebecca Rocke ("Rocke
affidavit").

16.  Pate deposition, p. 286.

17.  Rocke investigation notes, p. 3 (conversation
with Rodney Buhrsmith);  Defendant's motion for summary
judgment (Doc. No. 21), Exhibit E, affidavit of Rodney
Buhrsmith, p. 3.

9

subsequently told Pate not to discuss the matter and to stop urging other employees to call on her behalf.[18]

During Rocke's investigation, Pate never mentioned that other employees had put their hands down her jeans, touched her breasts, or invited her to touch another's breasts.[19]  The most that Pate communicated to Rocke was that "there were other things that had happened that evening."[20]  Based on her investigation, Rocke recommended Pate's termination.  This course of action was approved by Pate's immediate supervisor, the director of her division, and by the senior director of human resources, and reviewed by two members of West's upper management.[21]

_____

18. Rocke affidavit, p. 5; Pate deposition, pp. 286-288.

19. Pate deposition, pp. 188-189.

20. Defendant's motion for summary judgment (Doc. No. 21), Exhibit A-13, Transcript of unemployment insurance benefits hearing ("UIB hearing transcript"), p. 56.

21. Rocke affidavit, p. 6.

Pate was terminated on December 12, 2004, and her position was filled by a white male employee.[22]   Pate filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was terminated while "white male and female employees had engaged in similar or more inappropriate conduct without having had any kind of disciplinary action."   In a letter dated August 20, 2004, the EEOC requested that Pate provide additional information within ten days in order to avoid a determination that West had not discriminated against her.   The EEOC wrote to Pate that, "Despite your assertion that other employees engaged in inappropriate behavior at the same National Sales Conference ..., you have not supplied any names of such persons."   Pate did not supply names of the persons she alleged had also engaged in inappropriate behavior at the conference, and the EEOC issued a right to sue notice.

---

22. Defendant's motion for summary judgment (Doc. No. 21), Exhibit K, deposition of Ira Tiffenberg ("Tiffenberg deposition"), pp. 92-93.

11

It was not until her subsequent unemployment-insurance-benefits hearing that Pate first described the other employees' alleged inappropriate behavior at the conference,[23] and, perhaps most significantly, Pate did not even name these employees until after she initiated this lawsuit; she finally named them in her responses to Wsst's discovery requests in this litigation.[24]

## III. DISCUSSION

Under both Title VII and § 1981, it is, in general, illegal for an employer to discriminate against its employees because of their race or sex.   42 U.S.C.A. § 2000e-2(a)(1); 42 U.S.C.A. § 1981.[25]

_____

23. UIB hearing transcript, pp. 47-48.

24. Rocke affidavit, p. 7.

25. Because Title VII and § 1981 "have the same requirements of proof and use the same analytical framework," the court will "explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well." Standard v. A.B.E.L. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998).

12

## A. Hostile-Work Environment

In order to establish a hostile-work environment claim, Pate must show that (1) she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic, such as her sex or race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) imposition of liability on the defendant is appropriate. Walton v. Johnson & Johnson Servs., 347 F.3d 1272, 1279-1280 (11th Cir. 2003).

With regard to the fourth element, the Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Conduct will not be considered sufficiently hostile and pervasive, so as to alter the terms and conditions of employment, merely because an employee believes it to be so; instead, the work environment "must be both

13

objectively and subjectively offensive, one that a
reasonable person would find hostile or abusive, and one
that the victim in fact did perceive to be so." Id. at
787.

Pate has not responded in any way to West's motion
for summary judgment on her hostile-work-environment
claim, much less come forward with specific facts showing
a genuine issue for trial; indeed, the record suggests
that Pate intended to abandon this claim.[26]  Regardless,
the claim is not supported by any evidence.  Pate has
testified that she was completely satisfied with every
aspect of her employment until she was terminated.[27]

_____

26. Pate testified:

> "Q: Is there any claim at all in this
> case that relates to anything having to
> do with your employment at West, up
> until the time of your termination?
>
> "A: No."

Pate deposition, p. 67.

27. Pate testified:

(continued...)

14

Therefore, summary judgment will be granted on Pate's hostile-work-environment claim. <u>See</u> <u>Fitzpatrick</u>, 2 F .3d at 1115-16 ("For issues ... on which the non-movant would bear the burden of proof at trial, ... the moving party [for summary judgment] simply may show[]--that is, point[] out to the district court--that there is an absence of evidence to support the non-moving party's case.") (citations and quotation marks omitted).

## B. <u>Race and Sex Discrimination</u>

Pate's race and sex discrimination claims are governed by the familiar burden-shifting analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under the <u>McDonnell Douglas</u> approach, a plaintiff has the

---

27. (...continued)
   "Q: Up until the time of your termination, were you completely satisfied with every aspect of your employment at West?

   "A: Yes.  I loved my job, everyone loved me.  It was great."

Pate deposition, p. 67.

15

initial burden of establishing a prima-facie case of
unlawful employment discrimination by a preponderance of
the evidence. Id. at 802; Young v. General Food Corp.,
840 F.2d 825, 828 (11th Cir. 1988). If the plaintiff
establishes a prima-facie case, the burden then shifts to
the defendant to rebut the presumption by articulating
legitimate, non-discriminatory reasons for its employment
action. Chapman v. AI Transport, 229 F.3d 1012, 1024
(11th Cir. 2000). The defendant has the burden of
production, not of persuasion, and thus does not have to
persuade a court that it was actually motivated by the
reason advanced. See, e.g., Texas Dep't of Cmty Affairs
v. Burdine, 450 U.S. 248, 253-55, 258 (1981); McDonnell
Douglas, 411 U.S. at 802.

Once the defendant satisfies this burden of
production, "the presumption of discrimination is
eliminated and 'the plaintiff has the opportunity to come
forward with evidence, including the previously produced
evidence establishing the prima facie case, sufficient to

16

permit a reasonable factfinder to conclude that the reasons given by the [defendant] were not the real reasons for the adverse employment decision.'" Chapman, 229 F.3d at 1024 (citations omitted). The plaintiff may meet this burden by persuading the court that a discriminatory reason more than likely motivated the defendant or by demonstrating that the proffered reason for the employment decision is not worthy of belief. Burdine, 450 U.S. at 256; see also Young, 840 F.2d at 828.

To establish a prima-facie case of race or sex discrimination, Pate must show: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class. Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003). The

17

court will assume that Pate has established a prima-facie case.

West has also met its burden of coming forward with a legitimate, non-discriminatory reason for the challenged action: namely, that Pate violated the company's policies against sexual harassment. Therefore, the critical question is whether Pate has produced, or pointed to, sufficient evidence that West's stated reason is a pretext for retaliation. Pate asserts that pretext is indicated (1) by West's failure to follow its own guidelines in disciplining her and (2) because West failed to investigate similarly situated employees who acted inappropriately at the conference.

West's Disciplinary Procedures: The evidence before the court suggests that West's disciplinary procedures are remarkably ill-defined, notwithstanding the phrase "zero tolerance for harassment" featured in the company's Code of Business Conduct and Ethics. The senior director of human resources who approved of the decision to

terminate Pate--now the vice president of human resources at West--could identify no guidelines or criteria used by West in determining and applying appropriate levels of discipline for employee misconduct.[28]

_____

28. The record reflects:

"Q: You have located the Disciplinary Action for Code Violation. ... Based on those documents, what is your understanding of West's policy as it relates to disciplining employees?

"A: Basically, that Thomson would impose discipline for each violation specifically to this Code of Conduct, depending upon if it fits the nature and the facts of the violation.

"Q: Are there any criteria or explanations or any more information that would give an employee or a manager guidance as to how to evaluate the circumstances according to that policy?

"A: Not in this particular information right here.

"Q: Is there any information anywhere that would set forth those (continued...)

Members of West's management, including the investigator herself, gave Pate misleading information about the level of discipline she faced.  The director for West's academic division--the senior manager involved in the decision to terminate Pate--reassured Pate at the conference that she would receive only a letter of reprimand for her behavior.[29]

While Pate has produced evidence that the processes and interactions leading to her termination were opaque and misleading, these flaws do not render her termination discriminatory in violation of Title VII or § 1981.  It

--------

28. (...continued)
          guidelines or criteria?

    "A: I'm not aware right now.

                    ...

    "Q: What would Human Resources use to
        determine the level of discipline?

    "A: Information regarding the situation
        and judgment."

Tiffenberg deposition, p. 31-33.

    29. Pate deposition, p. 139.

is well settled that "federal courts do not sit to second-guess the business judgment of employers." Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1543 (11th Cir. 1997). Rocke's investigation and West's decision to terminate Pate may not have adhered to transparent guidelines, but they are not required by either Title VII or § 1981 to do so. The court is "not in the business of adjudging whether employment decisions are prudent or fair. Instead, [this court's] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision." Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir. 1999); see also Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1187 (11th Cir. 1984). ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").[30]

---

30. The core of Pate's complaint about West's alleged
(continued...)

<u>Disparate Treatment</u>:  Pate asserts that West's failure to investigate the employees who also behaved inappropriately at the conference suggests that the company's stated reason for her termination is pretextual.  Pate can establish pretext by showing that similarly situated or comparator employees were "involved in or accused of the same or similar conduct yet are disciplined in a different, more favorable manner," <u>Anderson v. WBMG-42</u>, 253 F.3d 561, 564 (11th Cir. 2001), or were not disciplined at all.

The acts that Pate describes--including co-workers placing their hands inside her jeans--are certainly similar in nature to the conduct for which she was

_____

30.  (...continued)
failure to follow its own procedures concerns the testimony of the vice president of human resources, who described an "improvement process" consisting of a verbal warning, a written warning, and a final warning. Tiffenberg deposition, p. 33.  However, the record reflects that this process applies to performance issues within the company, not disciplinary issues.  <u>Id</u>. Moreover, West would not be in violation of Title VII or § 1981 even if it failed to follow its own guidelines, so long as it did not do so in a discriminatory way.

investigated and ultimately terminated.   And the fact that Pate admitted her conduct, whereas no other employee did, has no bearing on whether there is legal significance to West's failure to investigate employees "involved in or accused of the same or similar conduct." Id.

However, Pate admits that she never reported or complained about inappropriate behavior other than her own during Rocke's investigation.[31]  Pate did not want to

---

31.  Pate testified:

"Q: Tell me who complained about Derek Moreton sticking his hands down your pants.

"A: I don't know who complained about that.  I didn't complain about it.

"Q: Tell me who complained about Chris Parton sticking his hands down your pants.

"A: I didn't complain about that either.

"Q: Tell me who complained about Dan Serlin touching your breasts.

(continued...)

23

"rat" on others and apparently believed that other
employees at the scene, including those who themselves
potentially faced investigation for inappropriate acts,
would come forward and accurately report all relevant
acts to the investigator.[32]   As a result, West first

---

31. (...continued)
    "A: I did not complain about that.  I
        had asked Derek Moreton to call
        Rebecca Rocke for me to talk to her
        about what had happened.

    "Q: Tell me who complained about Aimee
        Egan asking you to come to her room
        and feel her breasts.

    "A: I didn't complain about that
        either.

    "Q: Tell me who complained about
        Carolyn Strawbridge walking around
        and asking people if they wanted to
        touch her breasts.

    "A: I didn't complain about that."

Pate deposition, pp. 188-189.

    32. Pate said, "I did not want to get anyone in
trouble.  I did not think that I was going to be fired.
I was not going to give anyone else a letter of
reprimand, or anything else that may or may not happen.
And the reason that I wanted Rebecca to do a thorough
                                        (continued...)

learned the names of employees who Pate alleges acted inappropriately at the 2003 conference in discovery responses filed in this litigation.

West maintains that, because it lacked knowledge of these alleged actions at the time of Pate's termination, Pate cannot identify a single similarly situated white or male employee who was treated more favorably. Yet this is precisely what Pate has now done; she has named employees who may have acted inappropriately at the conference, and she has elicited testimony that those employees have not been investigated, as she was.[33]  This

_____

32.  (...continued)
investigation, like she should have, is so that she could possibly get that information from someone else so that I would not be the person to rat them out."  Pate deposition, pp. 190-191.

33.  The record reflects:

"Q: Does it concern you that you may have employees that remain employed by the Defendant that have also violated this policy and have not been terminated?

"A: Possibly.

(continued...)

25

evidence shifts the focus of the comparator analysis from

_____

    33. (...continued)
        "Q: Do you intend on investigating the allegations that Ms. Pate brought forth in her deposition yesterday?

        "A: I think at this late date – I mean, we're talking, you know, 18 months from the events.  I don't know that an investigation would be appropriate at this point.

        "Q: So the fact that it happened 18 months ago, it doesn't concern you that someone who is employed may have stuck his hands down Ms. Pate's pants?

        "A: I think it concerns me.  I think trying to get at this point in time accurate information and an understanding of exactly what happened when there were discussions – Ms. Pate had an opportunity to come forward during the initial investigation and provide any of that information. Prior to her being terminated, there was absolutely no information provided, and nobody else involved in this whole investigation came forward.... So I think it's extremely difficult to investigate at this point.

Tiffenberg deposition, pp. 95-96.

Pate's termination--which West has defended as resulting from Pate's violation of company policy--to the investigation that led to that termination.  In other words, Pate has produced evidence of disparate treatment, and in order to avoid a conclusion that the decision not to investigate suggests pretext, West must defend its decision by offering some legitimate and non-discriminatory reason for it.

West's corporate representative has testified that the company does not intend to investigate Pate's allegations because too much time has passed since the events in question.[34]  This is the entirety of the evidence on the record, from either party, concerning West's decision not to investigate.  The bare fact that time has passed since alleged misconduct took place does not establish conclusively that an employer's decision not to investigate that misconduct is legitimate and non-discriminatory, or, for that matter, otherwise.  Here,

---

34. Id.

however, West need only articulate a reason for the difference in treatment and then Pate bears the burden of proof to show otherwise, see Burdine, 450 U.S. at 253-55, 258 (the defendant has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced); and Pate has failed to produce or point to any evidence suggesting that West's only stated reason for not investigating other employees--distance in time--is not credible or is motivated by discriminatory intent. See Fitzpatrick, 2 F .3d at 1115-16 ("For issues ... on which the non-movant would bear the burden of proof at trial, ... the moving party [for summary judgment] simply may show[]--that is, point[] out to the district court--that there is an absence of evidence to support the non-moving party's case.") (citations and quotation marks omitted).

Nothing suggests whether West investigates employee claims only up to a certain point in time after a precipitating event and, if so, how the time-bar rule is

applied; nor is there evidence that West was less thorough in its investigation of the circumstances surrounding the complaint against Pate than it was in other circumstances, and that, but for this failure, West would have learned of the other alleged instances of sexual misconduct before Pate was terminated.  Without such evidence, the court cannot attribute a discriminatory purpose to West's statement that it has not investigated the other alleged instances of sexual misconduct only because it first learned of them so long after the alleged misconduct.  And if no discriminatory intent can be discerned in that decision, then Pate has no evidence to suggest that West's stated reason for her termination is pretextual.

One ill-advised interaction, which Pate and many of her colleagues perceived as a joke, cost Pate a well-paying job which she loved and at which she clearly excelled.  This is a steep cost, but it is not an impermissible one under Title VII and § 1981, for Pate

29

has failed to show that it was exacted because of her race or her sex. Accordingly, summary judgment on Pate's race and sex discrimination claims will be granted.

An appropriate judgment will be entered.

DONE, this the 3rd day of January, 2006.


        /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE